IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TIMOTHY BLUMENTRITT,

                Plaintiff,

   v.                                                         OPINION and ORDER

MAYO CLINIC HEALTH SYSTEM —                  17-cv-584-jdp
FRANCISCAN HEALTHCARE, INC.,

                Defendant.

---

      Plaintiff Timothy Blumentritt used to work as a case manager for defendant Mayo Clinic Health System—Franciscan Healthcare, Inc. Blumentritt alleges that Mayo Clinic fired him because of his sex, sexual orientation, and HIV and Hepatitis C diagnoses, and in retaliation for a complaint he filed about sexual orientation discrimination. Blumentritt brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a), and the Americans with Disabilities Act, 42 U.S.C. § 12112(a). Mayo Clinic has filed a motion for summary judgment, Dkt. 27, which is now briefed and ready for decision.

      The court will grant the motion. Blumentritt concedes that he does not have the evidence to support a claim under the Americans with Disabilities Act. As for the Title VII claims, the undisputed facts show that Mayo Clinic disciplined and ultimately fired Blumentritt for his chronic inability to complete patient charts. No reasonable jury could find that this reason was pretextual, or that Blumentritt's supervisors were motivated by a discriminatory intent. And Blumentritt has not adduced any evidence that the supervisors who fired him were aware of his alleged discrimination complaint, let alone retaliated against him for it.

UNDISPUTED FACTS

The court's assessment of the facts of this case is complicated by Blumentritt's failure to comply with the court's summary judgment procedures. Blumentritt purports to dispute some of the facts proposed by Mayo Clinic, Dkt. 36, but Blumentritt commonly failed to either state his version of the fact or cite evidence that supported his version, as the court's procedures require. Dkt. 13, at 10–11. ("If you dispute a proposed fact, state your version of the fact and cite to evidence that supports that version."). Instead, he simply asserted that a fact was "disputed" and cited generally to his affidavit, his own proposed findings of fact, or his brief, without pinpointing any evidence that would actually raise a dispute. The court's procedures require more. *Id.* at 11 ("The court will not search the record for evidence. Supporting evidence should be clearly cited and submitted.") Mayo Clinic's reply document, Dkt. 40, lays out the deficiencies in Blumentritt's responses.[1] The court will deem Mayo Clinic's proposed findings of fact to be undisputed. *Id.* at 10 ("The court will conclude that a proposed fact is undisputed unless the responding party explicitly disputes it and either identifies contradictory evidence

---

[1] For example, this is Blumentritt's response to one of Mayo Clinic's proposed findings of fact:

> 140. Ms. Scharringhausen was not aware of any complaints made by Blumentritt regarding what he felt was discriminatory treatment of himself. (Scharringhausen Tr. at p. 219:8—11; Scharringhausen Aff., ¶ 102.)
>
> **Response:** Disputed. See Blumentritt Affidavit, Proposed Findings of Fact, Brief of Plaintiff.

Dkt. 36, ¶ 140. None of the cited documents include evidence about Scharringhausen's knowledge of complaints.

in the record, or demonstrates that the proponent of the fact does not have admissible evidence to support it.").

The court has reviewed the documents submitted by Blumentritt, and the court is persuaded that even if the court scoured the record, Blumentritt has failed to adduce evidence that would raise a genuine dispute as to the facts that are material to Mayo Clinic's motion.

The following facts are undisputed, except where noted.

Blumentritt is a gay man. He started working for Mayo Clinic in 1990 as a case manager, coordinating mental health services for patients. As part of his duties, he was responsible for filling out admission and discharge papers, patient treatment plans, and other documents that went into patient charts.

In 2005, Blumentritt was promoted to a supervisor position, in which he oversaw other case managers and staff at several of Mayo Clinic's inpatient and outpatient facilities. While in the position as supervisor, Blumentritt reported to Bob Hillary, the director of behavioral health services, and Julie Conway, the department manager.

While Blumentritt was a supervisor, Conway made several comments to him related to his sexual orientation. During meetings, she would regularly note whether other employees were also gay. She did not make similar comments about heterosexual employees. At one time, she announced in Blumentritt's presence, "I wonder if my son is gay. He's artistic and he's sensitive. Well, if he was, I guess I would have no choice but to deal with it." Dkt. 41, ¶ 33.

At an unspecified time,[2] Julie Blakeman, an employee whom Blumentritt supervised, told him that she found out he was gay. She told him "Anyway, I'm sorry about it. I wanted to

---

[2] Neither party provides a date for this incident, but Conway testified that it occurred prior to 2010, Dkt. 25 (Conway Dep. 209:8–16), and Blumentritt testified that it occurred around

3

let you know I know you're gay. I'm ok with it (pause), but my religion isn't." Dkt. 41, ¶ 37. The next day, Blumentritt reported the incident to Hillary and Conway. But neither Hillary nor Conway spoke with Blakeman about the comments.

For several years, Blumentritt did well in the supervisor position. Through 2010, he received positive performance reviews from Hillary. But Hillary also noted that Blumentritt did not keep patient charts up to date. Up-to-date charts are important not only to maintain the quality of patient care, but also to comply with licensing requirements and state regulations. Hillary told Blumentritt that this was an area where he needed to improve, but he did not discipline Blumentritt for it.

In 2010, for unexplained reasons, Blumentritt became overwhelmed with his responsibilities as supervisor. He returned to a case manager position, and Gretchen Scharringhausen replaced him as supervisor. As a case manager, Blumentritt reported to Scharringhausen and Conway rather than Hillary. Blumentritt retained some of the duties that he had been assigned as supervisor, such as his role as a Mayo Clinic representative in several community organizations. These extra duties meant that he had more responsibilities than other employees in his department.

Although no longer a supervisor, Blumentritt continued to have issues keeping up with patient documentation. An audit in November 2011 revealed that Blumentritt had about 40 incomplete patient charts. This was a serious problem for Mayo Clinic, because if Blumentritt did not complete all of his documentation by mid-January, the clinic would be in violation of state regulations. Conway and Scharringhausen met with Blumentritt on December 5, and

---

2007. Dkt. 23 (Blumentritt Dep. 67:5–68:16).

Blumentritt signed a "coaching form," in which he agreed to complete one or two charts every day until he was caught up. Dkt. 32-1. But Blumentritt did not keep this pace. On February 9, he still had about 15 charts that were incomplete.

Conway and Scharringhausen placed Blumentritt on "formal performance counseling" until he finished updating his patient's charts. By March 6, Blumentritt was all caught up and was taken off of performance counseling. At his next performance review, on June 25, Scharringhausen gave Blumentritt positive feedback for fixing his documentation problem.

But in November 2012, Conway and Scharringhausen learned that a staff member was preparing insulin for a mental health patient, in violation of Mayo Clinic's policy. And when they investigated the incident, they discovered that the patient's chart—which Blumentritt was responsible for—was missing progress notes from the relevant time period. They also learned that Blumentritt was aware of the staff member's conduct but did not intervene or report the conduct to Conway and Scharringhausen.

After this incident, Conway and Scharringhausen placed Blumentritt back on performance counseling and gave him an improvement plan. Along with his ordinary duties, the plan required Blumentritt to:

1) write a document explaining the clinic's chain of command and submit it by November 9;

2) meet with Scharringhausen to clarify his roles and responsibilities by November 16 and submit a written summary of his roles and responsibilities by November 21; and

3) review the "five safe behaviors" and write a document explaining how they could have been applied to the insulin incident by November 23;

5

Dkt. 31-3, at 2. Conway and Scharringhausen warned Blumentritt that any failure to complete documentation according to Mayo Clinic's policies, or failure to adhere to the plan's timeline, would result in discharge.

Blumentritt completed the first step without difficulty, but Blumentritt and Scharringhausen were unable to meet for the second step until November 27. By that point, the deadlines for the second and third steps of the plan had already passed. So they scheduled a meeting for November 30, during which (1) Blumentritt would hand in the written summary of his roles and responsibilities, as required for step two; and (2) they would set a new schedule to finish step three of the plan.

When Conway, Scharringhausen, and Blumentritt met on November 30, Blumentritt had not completed the written summary. So they directed Blumentritt to provide the written summary at another meeting scheduled for December 17. On December 12, Scharringhausen emailed Blumentritt to remind him of the meeting and that he needed to provide a summary of his job responsibilities. She also asked him to prepare his summary of the "five safe behaviors" before the meeting, so that he could complete step three of the performance plan. Blumentritt did not complete either task before the December 17 meeting.

The parties do not explain what happened after Blumentritt failed to meet the December 17 deadline. But it appears from the record that Blumentritt did not receive any further discipline until February 2013, when an audit revealed that he again failed to complete patient charts. On February 21, Conway and Scharringhausen met with Blumentritt, and he acknowledged that he had again fallen behind. They told him that they would speak with human resources about his repeated documentation issues.

About one and a half weeks later, Blumentritt met with Lisa Radtke, a human resources employee.³ The parties dispute what was discussed at the meeting. Dkt. 36, ¶¶ 127–28. Mayo Clinic contends that Blumentritt never complained to Radtke about issues related to his sexual orientation. But Blumentritt says that he specifically complained that his rights were being violated, that he thought his sexual orientation had "been an issue for a long time," and that the issue was not being addressed by Mayo Clinic.⁴ Dkt. 33, ¶¶ 35–36.

On March 15, Conway and Scharringhausen met with Blumentritt and told him that he had one final chance to bring his documentation into compliance with Mayo Clinic's policies. A week later, Blumentritt reported to them that his charts were all up to date. But another audit on April 2 showed that one of Blumentritt's patient charts was missing a document that should have been completed in January.

Scharringhausen asked Blumentritt about the document, and he told her that he knew what she was referring to and would do it "right away." Dkt. 36, ¶ 87. But when she checked the record the next day, it was still incomplete. Conway and Scharringhausen met with Blumentritt, and he told them that he had not completed the patient's chart. Conway and Scharringhausen terminated Blumentritt's employment.

---

³ Blumentritt says that the meeting was about a month before his discharge, which would be on or around March 4. Dkt. 33, ¶ 38.

⁴ Blumentritt relies on his own affidavit to describe the meeting. Mayo Clinic objects that the affidavit contradicts Blumentritt's deposition testimony and should be excluded under the sham affidavit rule. *See Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). But the deposition testimony that Mayo Clinic cites refers to a *different* meeting, where Blumentritt raised unrelated concerns. Dkt. 24 (Blumentritt Dep. 143:24–145:10). Blumentritt testified that at the meeting in March 2013, he talked about his sexual orientation, along the same lines as outlined in his affidavit. *Id.* at 286:10–287:1. So the sham affidavit rule does not apply; the affidavit testimony is admissible.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Blumentritt contends that Mayo Clinic fired him for three reasons that are prohibited under Title VII: (1) because he is gay; (2) because he is a man; and (3) because he complained about sexual orientation discrimination in March 2013. The legal standard for the first two claims is the same, and Blumentritt relies on the same evidence for those two claims, so the court will consider them together. The court will then consider Blumentritt's retaliation claim separately.

A.  **Sex discrimination and sexual orientation discrimination claims**

Title VII prohibits workplace discrimination on the basis of sex, 42 U.S.C. §§ 2000e, *et seq*, which includes discrimination on the basis of sexual orientation. *See Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 351–52 (7th Cir. 2017). In this case, Blumentritt does not dispute that he was chronically behind on documentation. Nor does he dispute that proper documentation is vital to patient care, Mayo Clinic's business operations, and Mayo Clinic's compliance with state law. But he alleges that his supervisors let other employees' documentation issues slide, while cracking down on him. And he says that they did so because they were biased against him due to his sex and sexual orientation.

Courts have historically analyzed Title VII claims under the so-called "direct" and "indirect" methods, depending on the nature of the evidence presented. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016). But the court of appeals has observed that these methods "complicated and sidetracked employment-discrimination litigation for many years." *Id.* at 764. The better approach is to consider the evidence "as a whole," and focus on

the core issue: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. So to defeat summary judgment, Blumentritt must adduce evidence that would, considered as a whole, allow a reasonable jury to find that Mayo Clinic terminated him because of his sex or sexual orientation or both. He need not prove that his sex or sexual orientation was the exclusive reason for Mayo Clinic's decision, but it must have been a motivating factor. *See* 42 U.S.C. § 2000e-2m; *see also, e.g.*, *Hossack v. Floor Covering Assocs. of Joliet*, 492 F.3d 853, 860 (7th Cir. 2007).

Blumentritt points to three kinds of evidence to support his discrimination claim: (1) treatment of other Mayo Clinic employees; (2) conduct and statements by his supervisor Julie Conway about his sexual orientation; and (3) evidence calling into question the fairness of the decision to terminate him. The court considers each category of evidence in turn.

**1. Preferential treatment of other employees**

Blumentritt contends that other employees, who were not gay men, received more favorable treatment. More favorable treatment of other employees can be evidence of discrimination, but only if the other employees are similarly situated to the plaintiff. *Eaton v. Indiana Dept. of Corr.*, 657 F.3d 551, 559 (7th Cir. 2011). Employees are similarly situated if they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)). Employees that engaged in the same conduct, but not to the same degree, are not similarly situated. *Id.* at 594–95.

9

Blumentritt makes three arguments about other employees falling behind in their charting. But in all three arguments, he fails to adduce evidence that a similarly situated employee received more favorable treatment.

First, Blumentritt says that Marti Boerner, a heterosexual woman, also fell behind in her charting but did not get terminated. But he provides no details about the extent of her documentation problem. Blumentritt cites Julie Blakeman's deposition, but she testified that Boerner fell behind only infrequently. Dkt. 38 (Blakeman Dep. 60:23–25). Because it is undisputed that Blumentritt was consistently behind in his charting for months at a time, a reasonable jury could not infer that Boerner was similarly situated to him.

Second, Blumentritt says that when he was a supervisor, he did not discipline his employees for falling behind in their charting. But this is simply irrelevant. The question is whether *his* supervisors were treating him differently from other employees. How he treated his employees is not probative of that issue. *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008) ("Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee. So, to be similarly situated, [an employee] must have been treated more favorably by the same decisionmaker that fired the [plaintiff].").

Third, Blumentritt says that it was common in his department for staff to be behind in charting. But he fails to either identify any particular employees or describe the extent of the problem. Vague statements about other employees, without any details about how they actually performed, are insufficient to establish the existence of similarly situated employees. *See Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) ("[The plaintiff] did not supply details about these other incidents and thus could not establish that he and [the other

employee] engaged in similar behavior."). And again, Blumentritt cites testimony that does not support his claim of unequal treatment. Dkt. 25 (Conway Dep. 33:7–35:23) (stating that she could not recall how often other employees were delinquent); Dkt. 38 (Blakeman Dep. 60:23–64:6) (stating that some employees were only infrequently behind on charting and that she did not know how often other employees were behind on charting).

### 2. Expressions of discriminatory animus

Blumentritt cites three pieces of evidence to support his contention that Conway was motivated by discriminatory animus against gay people. First, he says that Conway "regularly" made comments in his presence about whether other employees were gay. Dkt. 41, ¶ 31. Second, Conway said in his presence, "I wonder if my son is gay . . . if he was, I guess I would have no choice but to deal with it." Dkt. 41, ¶ 33. Third, Blumentritt complained to Conway and Bob Hillary about Blakeman's comments that her religion was not "ok" with his sexual orientation, but Conway never told Blakeman that her comments were inappropriate. Dkt. 41, ¶ 37.

The statements by Conway and Blakeman are not overt expressions of animosity toward gay people, although the comments might be insensitive and disrespectful. But even if Conway were biased against gay people, that does not necessarily mean that she fired Blumentritt due to her prejudice. "Bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Harper v. Fulton Cty., Ill.*, 748 F.3d 761, 766 (7th Cir. 2014) (quoting *Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). And here, no reasonable jury could find a link between these incidents and the decision to fire Blumentritt, for two main reasons.

First, all these incidents occurred between 2005 and 2010, several years before Blumentritt was placed on performance counseling. Blumentritt concedes that Conway became more professional after he returned to the case manager position, and that she stopped making comments about his or anyone else's sexual orientation. So even if a jury concluded that Conway's comments before 2010 revealed her personal prejudices, there is no evidence that those prejudices animated her decisionmaking during the relevant period. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("isolated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'") (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)).

Second, Conway and Scharringhausen terminated Blumentritt only after giving him numerous opportunities to cure his performance deficiencies. Specifically, they placed him on a performance counseling plan, shepherded him through that plan, and then removed him from performance counseling when he caught up on his documentation. When Blumentritt was in compliance with his documentation requirements, he received positive feedback. And when he again fell out of compliance, they placed him on a second performance counseling plan and gave him at least two "final" chances to fix the problem. If Conway had been looking for a pretext to fire Blumentritt, then it would make little sense for her to wait so long and give Blumentritt so many chances to cure his deficiencies.[5]

---

[5] Blumentritt also argues that a jury could find a discriminatory motive because (1) both Conway and Scharringhausen are heterosexual women; and (2) nearly all of the Mayo Clinic employees who worked in his department, in management, or in human resources were women. But the sex and sexual orientation of the decisionmakers or other employees in the department are not in themselves evidence of discriminatory intent.

12

### 3. Evidence that Blumentritt's treatment was unfair

Blumentritt also attacks the overall fairness of his discipline and termination for three reasons: (1) Scharringhausen did not administer the performance counseling plan in "good faith" because she took a second job, and her new schedule caused her to miss several meetings with him; (2) he had good reasons for failing to complete his work; and (3) although the April 2013 audit showed that he had an incomplete patient chart, this was incorrect. None of this supports his claim that he was discharged due to his sex or sexual orientation.

The first contention is not supported by evidence. Presumably, Blumentritt means to argue that Scharringhausen was trying to set him up for failure and, from that, a jury could infer that her stated reason for firing him is pretextual. But Blumentritt does not explain how Scharringhausen's busy schedule disadvantaged him nor does he cite any evidence that she missed meetings intending to sabotage him.

The second and third contentions are simply not relevant. The question is not whether Mayo Clinic's decision was reasonable or fair or whether Mayo Clinic made a mistake; the only question is whether Mayo Clinic discriminated against Blumentritt because of his sex or sexual orientation. *See Simpson v. Beaver Dam Cmty. Hospitals, Inc.*, 780 F.3d 784, 795 (7th Cir. 2015). Federal courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003).

A plaintiff may be able to support a discrimination claim with evidence that the employer's claims of deficient performance are so unreasonable or unsupported that they are incredible. But Blumentritt comes nowhere close to making such a showing. Again, it is undisputed that Blumentritt consistently failed to complete his work. It is also undisputed that

the April 2013 audit showed that he had an incomplete patient chart, and that when asked about it by Conway and Scharringhausen, he told them that it was incomplete. Dkt. 36, ¶ 91. Because Blumentritt has failed to adduce any evidence that Conway and Scharringhausen did not honestly believe their stated reason for firing Blumentritt, it does not matter whether their decision may have been unwise or unfair.

    4. **Indirect method**

The parties also make arguments about whether Blumentritt can succeed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), often referred to as the "indirect" method of proof. *E.g., Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500 (7th Cir. 2017). Because the court has already considered all of Blumentritt's evidence, it will only briefly discuss how this evidence would be evaluated under the *McDonnel* framework.

To prevail under the *McDonnell* framework, Blumentritt must make a prima facie case with evidence that: (1) he is a member of a protected class; (2) he met Mayo Clinic's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008). If a plaintiff can satisfy all four prongs of the prima facie case, the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). If the defendant rebuts the prima facie case, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id.*

Blumentritt cannot make a prima facie showing for two reasons. First, he has not pointed to any similarly situated employees who had charting deficiencies comparable to his. Second, because of his consistent failure to complete patient charts, he was not meeting Mayo Clinic's legitimate job expectations. Furthermore, even if Blumentritt could make a prima facie showing, he has not adduced any evidence that Mayo Clinic's proffered reason for terminating him was pretextual. So Blumentritt cannot prevail under the burden-shifting framework of the indirect method either.

**B. Retaliation claim**

"Title VII protects persons not just from certain forms of job discrimination, but from retaliation for complaining about the types of discrimination it prohibits." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); 42 U.S.C. § 2000e–3(a). In this case, Blumentritt says that Mayo Clinic fired him in retaliation for complaining about sexual orientation discrimination to Lisa Radtke (a human resources employee) in 2013.

To prove his retaliation claim, Blumentritt must show that: (1) he engaged in a statutorily protected activity; (2) Mayo Clinic took materially adverse action against him; and (3) there is a causal connection between the activity and the adverse action. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). Mayo Clinic contends that Blumentritt cannot satisfy the first or third elements of his claim. Because the court concludes that Blumentritt has not adduced evidence of causation, it is unnecessary to decide whether he engaged in protected activity.

To prove causation on his retaliation claim, Blumentritt must show that he would not have been fired had he not complained to Radtke. *Ferrill*, 860 F.3d at 501. Blumentritt can't make that showing because he hasn't adduced any evidence that either Conway or

Scharringhausen even knew about his complaint to Radtke. Both Conway and Scharringhausen deny that they were aware of any complaint by Blumentritt about discrimination. Dkt. 31, ¶ 117–19 and Dkt. 32, ¶ 102. And although Blumentritt purports to dispute those assertions, Dkt. 36, ¶¶ 137–40, he does not cite, and has not adduced, any evidence to the contrary. For example, he does not cite evidence showing that Radtke would have normally shared such a complaint with Conway or Scharringhausen, or even that Radtke documented the complaint.

Blumentritt relies on the timing of events to show both knowledge and causation—Mayo Clinic fired him less than a month after he complained to Radtke. A plaintiff may rely on circumstantial evidence, such as suspicious timing, to establish a retaliation claim. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016). But "suspicious timing alone is rarely enough to create an inference of retaliatory motive," *id.* at 1021, because "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011).

And in this case, the timing is not suspicious. When Blumentritt complained to Radtke, he was already on his second performance counseling plan, and he had already failed to meet his obligations under that plan. He had been notified that failure to fix his patient chart issues would result in termination. Then, weeks before he complained to Radtke, an audit revealed that he had once again failed to complete patient charts. This long disciplinary record, prior to his complaint, undermines any inference of retaliation. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).

**C. Conclusion**

Because Blumentritt has failed to adduce any evidence that Mayo Clinic terminated him for reasons other than his well-documented deficiencies in maintaining patient charts, the court will grant Mayo Clinic's motion for summary judgment.

ORDER

IT IS ORDERED that defendant Mayo Clinic Health System—Franciscan Healthcare, Inc.'s motion for summary judgment, Dkt. 27, is GRANTED. The clerk of court is directed to enter judgment in favor of Mayo Clinic and close this case.

Entered February 6, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge